IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

DARRELL C. BERRY,                    )    Civil Action No. 3:12-2488-CMC-JRM
                                     )
            Plaintiff,               )
                                     )
      v.                             )    **REPORT AND RECOMMENDATION**
                                     )
CAROLYN W. COLVIN, ACTING            )
COMMISSIONER OF SOCIAL SECURITY,[1]  )
                                     )
            Defendant.               )
_____ )

 

 

      This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning

the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

      On August 22, 2005, Plaintiff applied for SSI and DIB, alleging disability as of March 14,

2005. Plaintiff's applications were denied initially and on reconsideration, and he requested a

hearing before an administrative law judge ("ALJ"). After a hearing held on October 16, 2007, the

ALJ issued a decision dated February 28, 2008, denying benefits. The ALJ found that Plaintiff was

_____

      [1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be
substituted for Commissioner Michael J. Astrue as Defendant in this action.

not disabled because under the medical-vocational guidelines (also known as the "Grids") promulgated by the Commissioner, Plaintiff remained able to perform work found in the national economy. See generally 20 C.F.R. Pt. 404, Subpt. P, App. 2. After the Appeals Council denied Plaintiff's request for review, he filed an action in United States District Court. See C/A No. 3:09-126-CMC-JRM. The undersigned issued a Report and Recommendation in that case on February 22, 2010, recommending that the case be remanded to the Commissioner to determine Plaintiff's residual functional capacity ("RFC") in light of all of the evidence (including the opinions of treating physicians Dr. Rashkin and Dr. Rouse), to properly evaluate Plaintiff's credibility in light of all of the evidence, and to continue the sequential evaluation process. Tr. 972-993. On March 12, 2010, the Honorable Cameron McGowan Currie, United States District Judge, adopted the Report and Recommendation, reversed the decision of the Commissioner, and remanded the case to the Commissioner for further action. Tr. 970-971.

Upon remand, a hearing was held on July 22, 2010 (Tr. 1811-1840) at which time Plaintiff amended his alleged disability onset date from March 14, 2005 to May 7, 2007 (Tr. 1816). On September 24, 2010, the ALJ thereafter issued a partially favorable decision, finding Plaintiff became disabled on November 3, 2008, and remained disabled through the date of the ALJ's September 24, 2010 decision.

Plaintiff was forty-one years old at the time he alleges he became disabled (May 7, 2007) and forty-two years old at the time the ALJ found that he became disabled (November 3, 2008). He has a high school education and past work experience as a dump truck driver, electric company lineman, manual laborer, and longshoreman. Tr. 1237, 1243.

The ALJ specifically found (Tr. 954-961):

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      Since the amended alleged onset date of disability, May 7, 2007, the claimant has had the following severe impairments: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4.      Since the alleged onset date of disability, May 7, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that prior to November 3, 2008, the date the claimant became disabled, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant was able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour day. The claimant was also limited to the performance of simple, routine and repetitive tasks.

6.      After careful consideration of the entire record, I find that beginning on November 3, 2008, the claimant was unable to perform work at any exertional level on a full-time basis.

7.      As a result of his residual functional capacity for the period before and after November 3, 2008, the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.      Prior to the established disability onset date, the claimant was a younger individual age 18-49. The claimant's age category has not changed since the established disability onset date (20 CFR 404.1563 and 416.963).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not an issue in this case because applying the Medical-Vocational Rules directly supports a finding of "not disabled," for the period prior to November 3, 2008, whether or not the claimant had transferable job skills (20 CFR 404.1568 and 416.968).

11.    Prior to November 3, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.    Beginning on November 3, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13.    The claimant was not disabled prior to November 3, 2008, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

On June 29, 2012, the Appeals Council declined to assume jurisdiction (Tr. 931-934), thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff filed this action in United States District Court on August 28, 2012.

## STANDARD OF REVIEW

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

On March 16, 2005, Plaintiff was treated at the South Bay Hospital Emergency Room ("South Bay ER") in Tampa, Florida after he fell off an unsecured ladder at work and injured his back. Tr.

4

571-573, see Tr. 349, 352, 358, 376, 772. Dr. Robert C. Henderson, an orthopedic surgeon, noted decreased generalized pin prick sensation on March 22, 2005. Straight leg raise testing from a seated position was negative. Dr. Henderson diagnosed Plaintiff with a medial meniscus tear on the right, lumbosacral strain, and disc disease. Tr. 376-378. Plaintiff was prescribed Anaprox and Ultram at the South Bay ER on March 24, 2005. Tr. 355-357. Plaintiff returned to Dr. Henderson on March 25, 2005. He scheduled an MRI; took Plaintiff off work; and gave him prescriptions for a cane, corset, and Vicodin. Tr. 382, 805.

On April 5, 2005, Dr. Henderson noted moderate spasm in Plaintiff's back. He released Plaintiff to light duty, but noted he was waiting for MRIs of Plaintiff's knee and back. Dr. Henderson's impression was a meniscus tear in Plaintiff's right knee and lumbosacral strain. Tr. 383, 804. On April 6, 2005, Dr. Joseph Rashkin (of Bay Area Pain Management) examined Plaintiff and noted impressions of chronic intractable lower back pain secondary to herniated lumbar disc, and sciatica of the right lower extremity. He prescribed a Medrol Dosepak, Soma, and noted that Plaintiff already had Percocet. Dr. Rashkin recommended neurosurgical and surgical consultations, and placed Plaintiff on temporary total disability until further notice. Tr. 693-695, 866-869. On the same day, Dr. Henderson noted that Plaintiff's MRIs (Tr. 320-321, 753-754) showed mild degenerative changes of the right knee and a small central disc at L4-5 with mild flattening of the thecal sac. His examination revealed that Plaintiff had some giveway weakness on the right, but straight leg raising was essentially negative. Dr. Henderson completed a Work Status Report stating that Plaintiff should stay out of work for two weeks. Tr. 379, 801-802.

After complaining to Dr. Rashkin of abdominal pain and vomiting, Plaintiff was treated at the South Bay ER on April 20, 2005. Esophagogastroduodenoscopy revealed extensive duodenal

erosions. Tr. 358-366. On April 25, 2005, Dr. Henderson noted giveway weakness with dorsiflexion, and decreased sensation in Plaintiff's left foot. Plaintiff could perform left and right lateral bending to thirty degrees with no involuntary spasm. Straight leg raise testing was negative. Tr. 384. Dr. Thomas M. Newman, a neurologist, also examined Plaintiff the same day. He noted that Plaintiff had decreased range of motion in his lower back, muscle spasms, and some right leg giveaway weakness, but Plaintiff exhibited normal reflexes, full 5/5 motor strength, normal sensation, and no muscle atrophy. Tr. 392-394, 833-835. Dr. Rashkin recommended anti-anxiety medications, continuation on Soma, no other analgesic medications, a neuromuscular thoracolumbar stimulation unit, and physical therapy on April 27, 2005. Tr. 696-697, 859-865.

Dr. Robert Martinez, a neurologist, examined Plaintiff on May 2, 2005. He noted that Plaintiff had an antalgic gait; thoracic tenderness and swelling; lumbar tenderness and swelling with a nodular muscle spasm; and positive straight leg raise tests bilaterally. Plaintiff's muscle tone was normal, he had full 5/5 strength in all extremities, intact sensation, and normal and symmetrical reflexes. Dr. Martinez recommended a neurological consultation, prescribed a TENS unit and home exercise, and told Plaintiff "[n]ot to lift greater than 20 pounds from a bent position, 10 pounds repetitively." Tr. 405-408. On May 6, 2005, Dr. Newman noted that Plaintiff continued to complain of pain and swelling of his lower thoracic spine. Plaintiff's was "temporarily off work." Tr. 398.

During May and June 2005, Plaintiff underwent physical therapy at Health South in Brandon, Florida. At discharge it was noted that Plaintiff had made minimum/moderate progress; had difficulty with bending, lifting, and prolonged ambulation; and had increased functional capacity, decreased pain, increased range of motion, and decreased spasm. Tr. 421-478.

On May 10, 2005, Dr. Rashkin noted that Plaintiff's MRI (Tr. 340) showed straightening of the thoracic spine suggesting ligamentous injury or sprain, and disc bulging and disc dessication at T11-12. Plaintiff had muscle spasm between T8 and T12. Tr. 698-699, 857-858. On May 26, 2005, Dr. Rashkin noted soft tissue paraspinal swelling that appeared to be severe muscle spasm from T8 to T11. He recommended further imaging, bilateral thoracolumbar facet joint nerve block, and physical therapy. Tr. 679-680. A thoracic spine CT scan on May 27, 2005 revealed spondylitic disc bulge at T11-12 resulting in mild canal and foraminal stenosis. Tr. 346. Nerve conduction studies on June 7, 2005 reflected results consistent with technical difficulties or bilateral S1 and left L5 radiculopathy. Tr. 387. On June 21, 2005, Dr. Rashkin noted that Plaintiff tried to go back to work but reported unbearable mid and low back pain. He recommended that Plaintiff continue Skelaxin and try a thoracolumbar facet nerve block. Dr. Rashkin opined that Plaintiff should be on total temporary disability and was not able to work at the job he was working before. Tr. 700.

On June 23, 2005, Dr. Martinez noted that Plaintiff continued to complain of low back pain, but had no radicular complaints. He recommended light duty full-time work with no lifting greater than twenty pounds. Plaintiff was no longer on anti-inflammatory drugs because of his GI problems. He was noted to be wearing a back brace. Tr. 410-413. On July 8, 2005, Dr. Newman wrote that Plaintiff was walking with a cane and using a corset, but Plaintiff's degree of dysfunction was far out of proportion to any objective findings (including his neurological exam, EMG, nerve conduction studies, and MRIs) and there appeared to be "some embellishment present on the findings on exam." He opined that it was not medically necessary for Plaintiff to see a pain management specialist. Tr. 401.

On July 11, 2005, Dr. Martinez noted that he reviewed medical records from all treating physicians. Plaintiff reported pain levels of 4-5 on a good day to 9-10 on a bad day. It appeared that Plaintiff had returned to work because he complained of difficulty at work (even though he did not have to do anything but walk up to a truck and write some numbers down) because his boots weighed a total of thirty-eight pounds. Plaintiff had an unremarkable gait with no focal motor, sensory, or reflex deficits, but had some tenderness and muscle spasm on his right lower back and positive straight leg raise testing. Dr. Martinez suggested follow up with an orthopedic surgeon or neurosurgeon, a TENS unit for chronic pain management, back exercises three times a day, medication, walking, and aqua therapy. Restrictions included no jumping or bouncing, and no lifting greater than twenty pounds from a bent position and ten pounds repetitively. Tr. 414-420.

On August 31, 2005, Plaintiff (who had moved to South Carolina from Florida) was seen at the St. James-Santee Family Health Center. Tr. 168, 170. An orthopedic referral and medications were given. Dr. Jafer Gheraibeh, an orthopedist, examined Plaintiff and prescribed Ultracet and Flexeril on October 13, 2005. Tr. 480.

Dr. Seham El-Ibiary, a state agency physician, reviewed Plaintiff's records in December 2005.
He opined that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently; standing/walking about six hours and sitting about six hours in an eight-hour workday; frequently climbing ramps and stairs, balancing, kneeling, and crouching; occasionally climbing ladders, ropes, and scaffolds; and occasionally stooping and crawling. Tr. 742-49.

Plaintiff was treated at the Winyah Chiropractic Clinic, from December 2005 to April 2006. Tr. 490, 494-499. On December 30, 2005, Dr. Gheraibeh observed that Plaintiff had lumbar lordosis,

was not standing straight, and was not able to bend over and touch his toes. He diagnosed chronic low back pain and prescribed medications. Tr. 480-481.

Dr. Gheraibeh noted that Plaintiff was using a cane to walk; prescribed a Lidocane patch, Flexeril, Ultracet, and Keflex; and referred Plaintiff for pain management on January 20, 2006. Tr. 481. On January 30, 2006, pain medication and a muscle relaxer were prescribed at the Georgetown Memorial Hospital ER ("Georgetown ER"). Tr. 276-277. Dr. Gheraibeh noted that Plaintiff continued to have severe muscle spasm on February 24, 2006. Tr. 481.

On March 17, 2006, Dr. Gheraibeh completed a form from Plaintiff's attorney which asked whether Plaintiff met or medically equaled the criteria of the Listing[2] at § 1.04 (disorders of the spine). Dr. Gheraibeh reported that Plaintiff had a small herniated disc at L4-5 with right L4 nerve root compression, limited range of motion, motor loss (weak right ankle dorsiflexion), loss of sensation on the inner side of Plaintiff's right leg, and weak right ankle reflexes. Tr. 175. He circled an answer on the form indicating that, even if the clinical findings did not match all of the criteria of Listing 1.04, Plaintiff's combination of impairments were medically equivalent to the severity of the conditions in Listing 1.04, but did not attach an additional page (as requested on the form) to explain his conclusion. Tr. 173-175. On April 4, 2006, Dr. Gheraibeh prescribed Soma and Ultracet for Plaintiff's back pain and instructed Plaintiff to return after an MRI was done. Tr. 482.

Plaintiff underwent a surgical consultation with Dr. Paul J. Zak, a Florida orthopedic surgeon, on April 21, 2006. Plaintiff rated his pain as ten out of ten, and reported that bending, general activity, sitting, standing, and walking made his pain worse. Plaintiff reportedly could stand with no

---

[2]This refers to one of the listings of impairments ("Listing") at 20 C.F.R. Pt. 404, Subpt. P, App. 1.

or minimal pain for forty-five minutes and walk fifty to two hundred feet with no or minimal pain. He used a cane for ambulation. Dr. Zak diagnosed lumbar disc displacement at L4-5 and thoracic/lumbar sprain/strain with severe muscle spasm. He prescribed a muscle relaxant and recommended that Plaintiff undergo trigger point injections and a discogram. Dr. Zak wrote that Plaintiff was on temporary total disability until he could be seen by a pain management physician, but also completed work status forms (that day and on May 1, 2006) indicating Plaintiff had permanent total disability. Tr. 577-579, 639, 713.

State agency physician Dr. William Cain reviewed Plaintiff's medical records in May 2006. He opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand/walk about six hours and sit about six hours in an eight-hour workday; frequently climb ramps and stairs and balance; occasionally stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, or scaffolds; and needed to avoid concentrated exposure to hazards. Additionally, Dr. Cain observed that there was no medical necessity indicated for the use of a cane. Tr. 704-709.

During a May 12, 2006 physical, Plaintiff reported no complaints. Tr. 168. He was treated at Georgetown ER on June 12, 2006 for back pain and radiation to his right leg. No neurological deficits were noted. A lumbar spine x-ray revealed degenerative disc disease. Tr. 279-285.

On July 25, 2006, Dr. Rashkin noted that Plaintiff complained of continued severe lower back pain. Examination revealed swelling with trigger points and muscle spasms to the right of the midline in the L1-2 and T11-12 area. Dr. Rashkin opined that Plaintiff could not perform any gainful employment and was permanently disabled. He recommended bilateral lumbar facet joint nerve block/lumbar epidural nerve block. Tr. 192-193, 176.

Plaintiff does not appear to have sought medical treatment again until March 8, 2007, at which time Dr. Rashkin wrote that Plaintiff remained on temporary total disability and opined in a separate note that Plaintiff should be on permanent total disability. Tr. 181, 191. Dr. Rashkin also completed a Medical Source Statement in which he opined that Plaintiff, because of chronic mid and low back pain, could lift less than ten pounds total; stand/walk for less than two hours total in an eight-hour workday; had an impairment on his ability to sit; had limited ability to push, pull, and handle; and could never reach, climb, balance, kneel, crouch, crawl, or stoop. Tr. 177-180. Additionally, Dr. Rashkin completed a Listing form at the request of Plaintiff's attorney. Dr. Rashkin opined that Plaintiff had a vertebrogenic disorder with radicular pain in the buttocks, no sensory loss, and no reflex loss. He noted that Plaintiff had pain, a history of muscle spasm, and significant limitation of motion in the spine in all movements. Dr. Rashkin opined that even if clinical findings did not meet all of the criteria of the Listing at § 1.04, Plaintiff's combined impairments were medically equivalent to the severity of the conditions in § 1.04. Dr. Rashkin did not attach a separate page to explain his conclusion, despite instructions to do so. Tr. 182-184.

While attending a church conference in Texas in May 2007 (Plaintiff's amended alleged onset of disability date), Plaintiff fell at a motel and sought emergency care at Baylor University. X-rays were reportedly negative. On May 15, 2007, Plaintiff sought care at Georgetown ER. He exhibited benign musculoskeletal findings including some muscle stiffness with no active tenderness, intact deep tendon reflexes, full 5/5 motor strength, and intact sensation. Tr. 226-227. MRIs of his cervical, thoracic, and lumbar spine were all essentially normal in June 2007. Tr. 230-232. Plaintiff was treated at the Georgetown Memorial Hospital for rectal bleeding from June 12 to 13, 2007. He reported taking Tylenol and Advil. The impression was acute gastrointestinal bleed likely

diverticulitis in origin, chronic low back pain, acute blood loss anemia, and mild dehydration. Tr. 236-238. He was readmitted from June 19 to 21, 2007, for an acute gastrointestinal bleed and duodenal ulcer. Tr. 252-258. In July and August 2007, Plaintiff sought care at Georgetown ER for back pain. Tr. 198-212. Weakness in his right leg, decreased sensation, and an inability to elicit reflexes were noted at St James-Santee Family Health Center on August 31, 2007. An orthopedic consult was recommended and medications were prescribed. Tr. 167, 169.

Plaintiff was examined by Dr. Leonard E. Forrest, an orthopedist, on November 12, 2007. Plaintiff reported that he did not have significant symptoms as long as he stayed within a reasonable level of limitations, and had not required any treatment for his back from spring of 2006 until his additional injury in May 2007. Dr. Forrest noted that Plaintiff appeared healthy, but walked with a cane, had muscle spasms in his back, and had sciatica symptoms in his right leg. Tr. 917-919. A lumbar and thoracic MRI on December 14, 2007 revealed mild loss of disc height and some disc protrusion and herniation at L3-4 with probable entrapment of the exiting third and fourth nerve roots, and mild signal loss at T11-12 with no disc protrusion. Tr. 915-916. On December 28, 2007, Dr. Forrest noted that Plaintiff had fallen when his right leg gave way. Back surgery was recommended. Tr. 925.

On December 31, 2007, Dr. Forrest completed a form at the request of Plaintiff's counsel in which he noted that Plaintiff had a vertebrogenic disorder lumbago, muscle spasm, and appropriate radicular distribution of significant motor loss in the right lower extremity. He opined that Plaintiff's impairments were equivalent in severity to the conditions described in § 1.04. Dr. Forrest noted, however, that Plaintiff did not have significant limitation of motion in the spine, had no sensory loss, and had no reflex loss. When asked to describe any muscle weakness, Dr. Forrest simply wrote that

Plaintiff had pain. Tr. 912-914. EMG and nerve conduction studies ("NCS") revealed evidence of acute radiculopathy at L3 and L4 on January 2, 2008.  Tr. 924.

Dr. Thomas F. Roush (a surgeon in practice with Dr. Forrest) began treating Plaintiff in January 2008. Tr. 943. Records indicate that Dr. Roush performed surgery on January 15, 2008, consisting of "Right L3-L4 far lateral disc excision of a herniated nucleus pulposus[;] [f]oraminotomy, right L3-L4 to decompress the right L3 nerve root [;] [f]ar lateral, extraforaminal, disc excision, right L4-L5[; and] [f]oraminotomy, right L4-L5 to decompress the right L4 nerve root[.]" Tr. 921-923.

On March 12, 2008, Dr. Roush wrote to Plaintiff's attorney, stating that Plaintiff made considerable improvement since surgery, but because of the prolonged neural compression (a profound neurological deficit from L4-5 disc herniation), he did not think Plaintiff would ever fully recover and would always be a danger to himself and potentially to others because the weakness in the right lower extremity could cause Plaintiff to lose control and fall down. Tr. 23. On March 13, 2008, Dr. Roush completed a Medical Source Statement in which he opined that Plaintiff could lift less than ten pounds total; stand/walk for less than two hours and sit for less than six hours in an eight-hour workday; engage in limited pushing and pulling; occasionally kneel, crouch, stoop, and reach;  never climb, balance, or crawl; and should have limited exposure to vibrations and hazards. Tr. 26-29. The same day, Dr. Roush completed a Listing form at the request of Plaintiff's attorney, in which he opined that Plaintiff had a vertebrogenic disorder with limitations of motion, motor loss, muscle weakness, sensory loss, and reflex loss. Tr. 30-31, 1673-1675.

On May 5, 2008, Dr. Roush noted that Plaintiff's right leg weakness was slightly improved. Nerve deficits and slightly diminished sensibility were noted. Plaintiff complained of a significant

pain in his right leg. Dr. Roush diagnosed lumbar disc disorder and wrote that "[p]atient may not return to work due to condition." Tr. 9-10, 1539. In a treatment note dated August 4, 2008, Dr. Roush indicated that Plaintiff had some right leg pain, but was "much improved from preoperative status" and did not need an assistive device most of the time. Dr. Roush's examination revealed slight neurologic deficits (4+/5 right quadriceps, 4/5 right anterior tibialis, 5-/5 EHL, 5-/5 right gastrosoleus, and 5-/5 right hamstring) and slightly diminished, but stable, sensation in the L3-4 dermatome. Dr. Roush opined that "[b]ecause of this and given his prior work description [Plaintiff] will not ever be able to get back to that type of heavier work. Certainly Vocational Rehabilitation [sic] to do some less strenuous activities is a reasonable way to go here if going back to work is being entertained from any party." Tr. 13.

On November 3, 2008, Plaintiff returned to Dr. Roush and reported right leg weakness, which caused him to fall down from time to time. Dr. Roush noted that Plaintiff was unable to do a single leg squat. Plaintiff was encouraged to continue with strength training and to continue taking his pain medication. Dr. Roush noted that although Plaintiff was greatly improved from pre-surgical times, he "still is nowhere near any sort of functional level where he could likely be gainfully employed." Tr. 1558.

On November 20, 2008 Dr. Carl E. Anderson, a state agency physician, reviewed the record and opined that Plaintiff could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; was limited to using controls frequently with his right lower extremities; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and could never climb ladders, ropes, or scaffolds. Tr. 1549-1556.

On December 1, 2008, Plaintiff presented to the emergency room with complaints of low back pain and right leg problems, stating that his right leg had given out on him four times in the past day or two. Plaintiff was treated and released. He was instructed to follow-up with his treating physician, Dr. Roush. Tr. 1582-1583.

Plaintiff saw Dr. Roush on December 11, 2008 and it was noted that Plaintiff's examination was unchanged with axial back pain and right lower extremity weakness. Dr. Roush continued Plaintiff on his pain medication, Percocet, and it was noted he was to return in six months for medication management. Tr. 1624. Plaintiff returned on February 16, 2009 and Dr. Roush assessed Plaintiff with intractable right lower extremity pain, status post extraforaminal discectomy with permanent neurologic injury and permanent impairment, at maximum medical improvement. Tr. 1595. On April 14, 2009, Dr. Roush ordered physical therapy, noting Plaintiff had the diagnosis of lumbar disc disease. He opined that Plaintiff could not work and was out of work pending follow-up. Tr. 1598-1599. Plaintiff continued to see Dr. Roush for follow-up appointments . See Tr. 1597, 1601, 1620-1621, 1627-1628.

On July 20, 2009, Plaintiff was taken to the emergency room after a fall. X-rays were performed and Plaintiff was discharged to home stable with a sling as a supportive measure. Tr. 1605-1609. On July 23, 2009 Plaintiff presented again to the emergency room because he was out of his pain medications and was still complaining of pain that he stated was radiating into his groin. It was noted that Plaintiff had a change in his symptoms and had "new" low back pain. Tr. 1610-1615.

Plaintiff underwent a lumbar MRI on August 17, 2009. Dr. Richard Holgate, a radiologist, noted that the MRI showed evidence of multilevel lumbar spondylosis with probable root compression particularly on the right side at the levels of L3-4 and L4-5. Tr. 1625-1626.

Plaintiff returned to Dr. Roush on August 21, 2009 with complaints of low back pain radiating into his right hip and down his right leg. He noted that the recent MRI showed recurrence of a small herniation on Plaintiff's right side affecting the third nerve root at L3-4. At the L4-5 level, Plaintiff had an acute annular tear on the right with some compression of the right fourth nerve root. Dr. Roush scheduled Plaintiff for a right L3 and L4 selective nerve root block. Tr. 1618. A patient status report dated September 25, 2009 from Southeastern Spine Institute noted that Plaintiff could not work. Tr. 1631.

On December 23, 2009, Plaintiff was examined by Dr. Donald Johnson of the Southeastern Spine Institute. Dr. Johnson noted that Plaintiff's MRI showed disc space collapse at the postoperative levels 3-4 and 4-5, with annular tearing at both discs. He wrote that Plaintiff could have epidural injections every 4 months. Dr. Johnson stated he would endorse Plaintiff's application for Social Security disability. Tr. 1650.

In approximately January 2010, Dr. Jarrod Reynolds of St. James-Santee Family Health Center stated in a letter that Plaintiff had physical limitations and should be placed on disability. Tr. 1651-1652.[3] On January 28, 2010, Dr. Johnson submitted a status report in which he opined that Plaintiff was totally and permanently disabled from working. Tr. 1653.

---

[3]The letter is undated, but Plaintiff's attorney stated it was received in her office on January 21, 2010.  Tr. 1651-1652.

The Plaintiff returned to the Southeastern Spine Institute and saw Dr. Leonard Forrest on March 26, 2010. A new MRI was recommended and Plaintiff was prescribed a back brace. It was noted that Plaintiff was using a cane to ambulate. Tr. 1655. After participating in physical therapy, Plaintiff reported (on April 30, 2010) to Dr. Forrest that it had been beneficial, but that his leg pain returned. Dr. Forrest recommended right L3 and L4 transforaminal injections. Tr. 1776.

## **HEARING TESTIMONY**

At the October 16, 2007 hearing, Plaintiff testified that he had constant sharp pain and "a big old knot" in his back that caused him to walk with a cane. Tr. 54. He reported that his pain worsened since 2005, and he had numbness and pain in his right leg. Plaintiff stated that he could not walk from the hearing room to the parking lot without having to stop, could sit for one hour, and had to lean forward when sitting because it hurt to sit up straight. Tr. 60-61. He testified that he could not lift, and had difficulty gripping objects, reaching overhead, balancing, bending over, stooping, and climbing stairs. Tr. 62. Plaintiff reported that, due to his medications, he had difficulty staying focused and remembering to complete tasks. Tr. 63.

Plaintiff stated that he lived in a tent for the last few months and would lie down in the tent without a mattress until it became hot, at which point he went to the store and sat down. Tr. 64-65. He carried jugs of water back to his tent from an irrigation system to wash and cook. Tr. 65. He said he received a $35,000 workers compensation settlement which he lived on until it ran out earlier in 2007, and he received medications through a program for indigent individuals. Tr. 52, 67.

At the July 22, 2010 administrative hearing, Plaintiff testified that his right leg gave out on him without warning, and doctors told him to use a cane so that he could balance and not fall. Tr. 1821. Plaintiff initially asserted that he started using the cane after his January 2008 surgery, but later

17

admitted that, in August 2008, he could walk and "get around pretty good." Tr. 1834-1835. He then responded "right" to a statement that in August 2008 he could not walk. Tr. 1836. Plaintiff said that his condition was "[a]bout the same" in November 2008. Id. Plaintiff testified he experienced problems with his hip after a fall in mid-2009. Tr. 1822.

Plaintiff testified that he was unable to drive because he could not sit up because of pain, and was unable to lift his right leg fast enough to hit the brakes. Tr. 1828-1829. He stated that he stayed home mostly with his mom who cooked for him. Tr. 1829. Plaintiff reported he longer participated in social or athletic activities because of his pain. Tr. 1829.

### DISCUSSION

Plaintiff alleges that: (1) the Commissioner erred in inferring an onset date without consulting a medical advisor as required by SSR 83-20; (2) the Commissioner erred in failing to give the treating doctor's medical opinions controlling weight regarding his onset date when the opinions were well supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with other substantial evidence[4] on the record; and (3) the treating physicians' opinions showed he met or equaled the Listing at § 1.04 on May 7, 2007 (the time of his fall at the Texas motel) and did not have the RFC to perform light work during the relevant time period. The

---

[4]Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff did not meet the statutory requirements for disability between May 7, 2007 and November 2, 2008.

    A.    <u>Listing of Impairments</u>

Plaintiff alleges that the he met or equaled the Listing at § 1.04(A) based on the opinions of his treating physicians (Drs. Rashkin, Forrest, and Roush) that he matched or equaled this Listing. He argues that these opinions should have been given controlling weight. The Commissioner contends Plaintiff's spinal impairments did not meet or equal the criteria of § 1.04 and Plaintiff did not meet his burden to show that he met or medically equaled this listing.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period...during which all the criteria in the Listing of Impairments [were] met." <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of § 1.05C; remanded on other grounds).

Merely "coming close" to meeting a listing is not enough to establish equivalence, and a claimant cannot establish equivalence merely by showing that the overall functional impact of his combination of impairments was as severe as that of a listed (i.e. presumptively disabling) impairment. See Zebley, 493 U.S. at 531. Instead, the claimant must present medical findings equal in severity to every criterion in a listing. See id.

The Listing at § 1.04(A)[5] requires:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 1.04.

The opinions that Plaintiff met or equaled § 1.04 are opinions reserved to the Commissioner. The regulations do not require that the ALJ accept an opinion from a treating physician when the physician opines on an issue reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). Specifically as to opinions on a plaintiff's RFC, the regulations provide that the ALJ shall use treating physicians' opinions on the nature and severity of an impairment, including a plaintiff's RFC, or whether an impairment meets or equals the requirements of a listing, but "the final responsibility for deciding these issues is reserved to the Commissioner," and the ALJ "will not give

_____

[5]Plaintiff does not allege that he met or equaled the Listing at 1.04(B)(spinal arachnoiditis) or 1.04(C)(lumbar spinal stenosis resulting in pseudoclaudication).

any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2) and (3).

Here, the ALJ specifically considered the opinions of Dr. Rashkin and Roush (and implicitly considered the opinion of Dr. Forrest) that Plaintiff met or equaled § 1.04. His decision to discount Dr. Raskin's opinion (as discussed further below) is supported by substantial evidence because the opinion was given prior to the alleged onset date and was not supported by clinical findings. Tr. 957.

Although it is unclear whether the ALJ's decision to discount Dr. Roush's opinion concerning Plaintiff's RFC (as discussed further below) is supported by substantial evidence, the ALJ's decision to discount Dr. Roush's opinion concerning Plaintiff having met certain of the criteria at § 1.04 is supported by substantial evidence as Plaintiff did not show that he met or equaled this Listing. Although Dr. Forrest opined that Plaintiff's combined impairments were equivalent to the severity of the Listing, the decision to discount this (see Tr. 958) is supported by substantial evidence as Dr. Forrest found no sensory or reflex loss. Tr. 914, 1671.

Plaintiff fails to show that he met or equaled § 1.04(A) during the relevant time period. Dr. Raskin and Dr. Forrest found that Plaintiff did not have the appropriate radicular distribution of sensory or reflex loss (as required by § 1.04). Tr. 184, 914, 1671. Dr. Forrest found that Plaintiff did not have significant limitation of motion of his spine (as required by § 1.04). Tr. 913, 1670. Further, Plaintiff has not shown that he had the required positive straight leg raise testing in the seated and supine positions.[6]

---

[6]There are some periodic positive straight leg test results, but it is unclear whether the results were positive in both the seated and supine positions as required by § 1.04(A), or that these findings were consistently positive for the required time period.

B.    <u>Treating Physicians</u>

Plaintiff alleges that the ALJ erred in failing to give his treating doctors' medical opinions controlling weight regarding his onset date when they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with the other substantial evidence in the case record.  In particular, he argues that Dr. Raskin's opinion in 2007 (Tr. 182-184), Dr. Forrest's opinion in 2007 (Tr. 912-914), and Dr. Roush's opinion in 2008 (Tr. 1673-1675) should have been given controlling weight. Plaintiff also argues that medical source statements and opinions of Dr. Rashkin in 2007 (Tr. 177-180), Dr. Roush in 2008 (Tr. 26-29), and Dr. Roush in 2009 (Tr. 1627-1628) indicate that he was unable to engage in a full range of sedentary work and that these opinions should have been given controlling weight. The Commissioner contends that the ALJ reasonably assessed medical source opinions regarding Plaintiff's functioning.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  <u>See</u> 20 C.F.R. §§ 404.1527 and 416.927; <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996).  Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." <u>Mastro v. Apfel</u>, 270 F.3d at 178 (citing <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the

physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount the opinion of treating physician Ruskin is supported by substantial evidence and correct under controlling law. In March 2007, Dr. Ruskin opined that Plaintiff was limited to lifting less than ten pounds, standing for less than two hours in an eight-hour workday, and had limitations in sitting. The ALJ properly discounted this opinion because it pertained to the period before the amended alleged disability onset date in May 2007, and was not supported by the clinical findings. See Tr. 957. In particular, Plaintiff had normal MRIs in June 2007, and generally normal examination findings during mid- 2007 (including negative straight leg raise tests, intact sensation and reflexes, and a normal gait). Tr. 955, 958, see, e.g., Tr. 163, 227, 230-232, 1576.[7]

It is unclear that the ALJ's decision to discount Dr. Roush's opinion that Plaintiff had an RFC for less than sedentary work is supported by substantial evidence. In March 2008, Dr. Roush opined that Plaintiff was limited to lifting less than ten pounds, standing for less than two hours, and sitting less than six hours. Tr. 26-29. The ALJ discounted Dr. Roush's March 2008 opinion in part (Tr. 958) because Dr. Roush opined in August 2008 that Plaintiff had a thirteen percent impairment due to his

---

[7]As noted above, the ALJ's decision to discount Dr. Forrest's December 2007 opinion that Plaintiff's combination of impairments were equivalent to the severity of conditions in § 1.04 is supported by substantial evidence.

back, and although he could not return to his past heavy work as a longshoreman, it was reasonable to consider vocational rehabilitation to do some less strenuous activities (Tr. 1036). It is unclear, however, that the ability to perform some less strenuous activities translates into the ability to perform a full range of light work. Additionally, Dr. Roush also opined on August 3, 2008 that Plaintiff could not work. Tr. 1035.

The ALJ also appears to have discounted Dr. Roush's opinion based on a finding that the clinical findings prior to November 3, 2008 failed to support such restrictions. Tr. 957. He also appears to have discounted this opinion because Plaintiff's condition "drastically" improved following surgery. Review of Dr. Roush's medical notes from January to November 2008, however, indicate that while Plaintiff experienced much improvement from his pre-surgical condition, Dr. Roush continued to note that Plaintiff had decreased sensation and strength. On January 29, 2008, Dr. Roush noted that Plaintiff still had profound neurologic deficits to his right lower extremity (Tr. 1541); on February 25, 2008, he noted that Plaintiff still had diffuse weakness throughout his right lower extremity (Tr. 1540); on May 5, 2008, he noted that Plaintiff had nerve deficits with slightly diminished sensibility (Tr. 1539); and on August 4, 2008, he noted that Plaintiff still had substantial weakness, persistent pain, nerve deficits, and slightly diminished sensibility (Tr. 1538).

C.    RFC/Onset Date of Disability

Plaintiff alleges that the ALJ erred in finding that he had the RFC to perform a full range of light work during the relevant time period. In particular, he argues that the ALJ erroneously disregarded the opinions of his treating physicians that his RFC was limited to less than a full range of sedentary work both prior to and subsequent to the amended alleged onset date (May 7, 2007). He also argues that the ALJ's RFC determination is not supported by the medical evidence which

includes five emergency room visits for severe back pain, hospitalization for gastrointestinal bleeding from pain medication, multiple chiropractor and general practitioner visits, evaluation and testing by orthopedic specialists, decompression surgery of Plaintiff's spine at two levels, and post-surgical follow up. Plaintiff argues that the ALJ should have found him disabled as of May 7, 2007. The Commissioner contends the ALJ reasonably found that, until November 2, 2008, Plaintiff retained the ability to do unskilled light work. The Commissioner argues that the ALJ carefully considered the entire record (including medical evidence, Plaintiff's subjective statements, and medical source opinions) and found that Plaintiff had the RFC to do unskilled light work.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

It is unclear that the ALJ's determination that Plaintiff could perform the full range of light work during the relevant period is supported by substantial evidence. The ALJ discounted the opinions of all of Plaintiff's treating physicians as discussed above. He also accorded little weight to the opinions of the state agency medical consultants. It is unclear from the ALJ's decision what evidence was relied on to determine that Plaintiff could perform light work, particularly after the December 2007 MRI which revealed disc herniation and EMG/NCS in January 2008 which revealed acute radiculopathy likely at both L3 and L4. The ALJ appears to have decided that Plaintiff was

capable of performing the full range of light work after surgery based on Plaintiff's improvement after surgery. The ALJ, however, does not appear to have fully considered all of the evidence in making this determination. As discussed above, Dr. Roush continued to report that Plaintiff had decreased sensation and strength. Although the ALJ correctly noted Plaintiff had some improvement with physical therapy after surgery, the record indicates Plaintiff continued to report significant limitations due to muscular weakness. Tr. 1735.

Plaintiff argues that the evidence regarding his onset date is clear based on Dr. Roush's opinion in February 2008 that the fall in May of 2007 was the origin of the interventions and surgeries performed on Plaintiff. Plaintiff also argues that the ALJ erred in inferring an onset date of November 3, 2008, without the consultation of a medical advisor pursuant to SSR 83-20. The Commissioner contends that the ALJ reasonably found that Plaintiff's condition deteriorated in November 2008 based on Dr. Roush's observation for the first time that Plaintiff was unable to do a single leg squat and that in November and December 2008 Plaintiff reported repeated falls due to right leg weakness. Additionally, the Commissioner contends that because the record was not insufficient or unclear, the ALJ did not need to consult a medical expert.

The ALJ's determination that Plaintiff's disability began on November 3, 2008 is not supported by substantial evidence as it is unclear that Plaintiff had an RFC for the full range of light work up until that time. Further, as noted by the ALJ, Plaintiff's condition deteriorated in December 2007 based on objective medical evidence (December 2007 MRI and January EMG/NCS) and surgery was recommended. Although the parties do not dispute that Plaintiff improved at least somewhat after the surgery, it is unclear from the evidence that Plaintiff had the RFC to perform the full range of light work after the surgery. The Commissioner contends that Plaintiff's condition

worsened in November 2008 because for the first time Dr. Roush noted that Plaintiff could not perform a single leg squat. Dr. Roush's notes on that date, however, provide that Plaintiff remained at maximum medical improvement, he was "still greatly debilitated by his right lower extremity weakness," his condition continued to force him to fall down from time, and examination was "exactly unchanged from the last several visits." Dr. Roush also noted that although Plaintiff remained greatly improved from his pre-surgical condition, he "still" was "nowhere near any sort of functional level where he could likely be gainfully employed." Tr. 1558. Thus, this action should be remanded to the Commissioner to determine Plaintiff's RFC and onset date based on all of the evidence.[8]

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to properly consider the opinions of treating physician Dr. Roush, determine Plaintiff's RFC, and determine Plaintiff's onset date of disability in light of all of the evidence and in accordance with controlling law.

---

[8]Although SSR 83-20 does not mandate the use of a medical advisor anytime an onset date is inferred, the ALJ should determine if such consultation is necessary based on applicable law. <u>See</u> SSR 83-20 ("In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred."); <u>Bailey v. Chater</u>, 68 F.3d 75, 79-80 (4th Cir. 1995)(holding that the use of a medical advisor was necessary where the onset date was ambiguous, but noting that SSR does not expressly mandate that an ALJ consult a medical advisor in every case where the onset of disability must be inferred).

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

October 4, 2013
Columbia, South Carolina